## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SARAH M. PETERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:13-CV-0605-SLB |
| | ) | |
| UNIVERSITY OF ALABAMA | ) | |
| HEALTH SERVICES FOUNDATION, | ) | |
| P.C., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 22.)[1] Plaintiff Sarah M. Peterson has sued her former employer, defendant University of Alabama Health Services Foundation [hereinafter "the Foundation"], alleging that the Foundation discriminated against her on the basis of her race and that it retaliated against her for complaining about discrimination in violation of federal law. Peterson also alleges she was terminated in violation of Alabama law because she had filed a claim for worker's compensation benefits. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the Foundation's Motion for Summary Judgment, (doc. 22), is due to be granted.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record. Page numbers for documents refer to the page number assigned by the court's CM/ECF system, except that page numbers for deposition transcripts refer to page numbers of the original deposition transcript.

# I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II. <u>STATEMENT OF FACTS</u>

### A.   PETERSON'S EMPLOYMENT WITH THE FOUNDATION BEFORE NOVEMBER 2011.

In 1997 Peterson, African-American, began working for the Foundation as a Receptionist/Assistant at the Substance Abuse Clinic. (Doc. 24-1 at 22, 24-25; doc. 39-3 ¶ 1.) After the Substance Abuse Clinic closed, Peterson held various positions with the Foundation, before transferring to the Dermatology Clinic in January 2011 as a Patient Encounter Specialist [hereinafter "PES"]. (Doc. 24-1 at 27, 29-31, 36, 67; doc. 33 ¶ 2.) She worked primarily at the check-out desk performing clerical and customer-service responsibilities, such as documenting charges, accepting payments, verifying the patient's identity, answering the phone, and scheduling appointments. (Doc. 33 ¶¶ 2, 3.) She

received an excellent evaluation in October 2011 from her then-supervisor, Kimberley Turnley, African-American. (*See* doc. 27 at 2-5; doc. 25 at 100.)

On November 15, 2011, Turnley met with Peterson and her coworker, Heather Moody, white PES also assigned to the check-out desk, to discuss "teamwork" and "communications." (*See* doc. 24-1 at 64; doc. 25 at 102, 104; doc. 27 at 37.) Shortly thereafter, Erika Sanso, white RN Practice Manager, replaced Turnley as Peterson's supervisor. (Doc. 24-1 at 37; doc. 25 at 100; doc. 33 ¶ 2.) The Practice Manager supervises the 34-36 employees in the Dermatology Clinic. (Doc. 25 at 22.)

## B.  PETERSON'S JANUARY 19, 2012, INJURY

On January 19, 2012, Peterson fell from her chair at work and suffered a rotator cuff injury to her left shoulder. (Doc. 24-1 at 107, 110, 112; doc. 39-3 ¶ 30.)  She notified Loretta Nicholson, an employee in the medical records area, who called her supervisor, Betty Franks, and Franks sent Peterson to UAB Highlands Hospital for evaluation that day. (Doc. 24-1 at 66, 108-09.)  Peterson subsequently attended doctor visits and physical therapy sessions, for which she received worker's compensation benefits and coverage. (*Id*. at 113-17.) She testified, "There were times in 2012 that I had to be absent or leave early to go to doctor['s] appointments or physical therapy." (Doc. 39-3 ¶ 31.)

## C.  PETERSON'S JANUARY 2012 COMPLAINT TO PARDUE

On January 30, 2012, Peterson emailed Towana Pardue, white Chief Nursing Officer and Sanso's supervisor. (Doc. 29 at 7.)  She complained:

4

[W]hen I go to Erika [Sanso] about a situation she is very short and rude.  I was under the impression that all employee[s were] to be treated fair[ly].  Today a situation came up with a patient that need[ed] authorization for an appointment on [January 31, 2011.]  I asked [Sanso] would she call Viva and let me know whether I need[ed] to reschedule the appointment[;] she never got back to me[.]  [S]o I call[ed] her and she told me . . . that [had] been taken care of as if I was interrupting her.  I am only trying to do my job, but when you are put in a hostile environment it become[s] hard to be effective.

(*Id.*; *see also* doc. 24-1 at 65, 68-69, 73-74.)  Peterson testified that Sanso had said, "Sarah, it's been taken care of," and that she believed Sanso was "rude" based on the tone of her voice.  (Doc. 24-1 at 70-71.)  She also complained to Pardue that Sanso had not offered to help her that day when she was working the check-out desk alone.  (Doc. 29 at 7.)

Peterson met with Pardue several days later, at which time she told Pardue that Sanso treated white employees better than African-American employees based on the fact Sanso was friendlier to white employees and she was more concerned about them.[2]  (*Id.* at 75, 77-79.)  She also testified that Pardue had said she would talk to Sanso; however, Peterson did not know if Pardue actually had talked to Sanso.  (*Id.* at 77, 80; doc. 24-2 at 259.)  Pardue testified that she did not talk to Sanso about Peterson's email and that she "never told anyone that Ms. Peterson complained that Ms. Sanso treated white employees better than she treated black employees."  (Doc. 32 ¶¶ 5, 6.)

---

[2]Pardue testified that she did not recall meeting with Peterson regarding this email and that Peterson never complained to her that Sanso was discriminating against African-American employees.  (Doc. 32 ¶¶ 3-4.)

**D.  JANUARY 2012 TO MAY 2012 PERFORMANCE ISSUES AND DISCIPLINE**

    **1.  Patient Complaints**

According to Sanso, she received a number of complaints about Peterson's behavior and job performance between January and May 2012.  (Doc. 25 at 72-73, 79-80, 88-93, 95-96.)  Sanso testified that the Dermatology Clinic rarely got negative feedback from patients, but, in the first few months of 2012, she had received two patient comment cards complaining about customer service at the check-out desk.  (Doc. 33 ¶ 7.)

In January 2012 an unidentified patient rated the "black lady at checkout" as  "poor" with regard to courtesy and sensitivity.  (Doc. 28 at 12.)  The patient indicated that his or her likelihood of returning or recommending the clinic was "very poor."  (*Id*.)  Peterson was the only "black lady" assigned primarily to the check-out desk during this time period.  (Doc. 25 at 163.)  However, during this time, Melanie Jones, an African-American PES, occasionally covered for check-out personnel while they were on breaks.  (Doc. 39-3 ¶ 7.)

In March 2012, Sanso received another anonymous patient comment card, which stated that his or her visit could have been better with "faster checkout" and that the courtesy of the check-out desk was only "fair."  (Doc. 28 at 13.)  This comment card did not identify or describe Peterson as the PES involved with the patient's check-out, (*see id*.); therefore, it could have referred to any PES.

## 2. Coworker Complaints

One of Peterson's coworkers, Aubrey Gamble, the white PES primarily assigned to the check-out desk with Peterson after Moody took a maternity leave, reported to Sanso that she was concerned about Peterson's inappropriate interactions with patients.  (Doc. 24-1 at 63-64; doc. 25 at 73-74.)  According to Sanso, Gamble complained that Peterson "doesn't interact well with patients," and Sanso asked Gamble to provide her with specific incidents.  (Doc. 25 at 74.)  Thereafter, in April 2012, Gamble emailed Sanso about two incidents of poor customer service:  (1) Peterson had interrupted an elderly patient, and (2) she had not ended a personal telephone call to help a waiting patient.  (*Id*. at 72-73, 77-78;  doc. 27 at 29.)

Cheryl Goodwin, white Team Lead, talked to Sanso about Peterson's rude reaction when asked a question about charge tickets or entries, including exhibiting negative body language.  (Doc. 25 at 80; doc. 33 ¶ 8.)  Goodwin reported to Sanso that, although Peterson ultimately would answer her questions, she "acted as though she did not want to answer and would act rudely."  (Doc. 25 at 80)  On April 19, 2012, Goodwin reported to Sanso that Peterson appeared to be working unnecessary overtime; she told Sanso that she had seen Peterson at work at 5:25 p.m. and that all the patients had left the clinic by 4:30 p.m. or 4:45 p.m.  (*See* doc. 27 at 31.)  Peterson generally disputes that she worked unnecessary overtime.  (*See* doc. 39-3 ¶ 8 ["I did not work unnecessary overtime.  I communicated with Ms. Sanso if there was a need for me to stay late or come in early.  There was always a lot to do after

the last patient left, and we would get telephone calls from patients asking questions regarding appointments after 5:00 p.m. on occasion."].)  Also, she contends that "the record supports the fact that during this time period, [she] was communicating with Sanso when there was a need to work over."  (Doc. 38 at 6 [citing doc. 25 at 62-64 [Sanso testified as to three instances of plaintiff communicating with her regarding working outside her normal schedule in February 2012]; doc. 27 at 19-21 [emails regarding the three February 2012 communications].)  She has not presented evidence that she had communicated with Sanso on April 19, 2012, about working late or that she was performing work-related activities on that day.

Peterson testified that Sanso did not bring Goodwin's complaints to her attention. (Doc. 39-3 ¶ 10.)  Moreover, she denies that she responded negatively to Goodwin.  (*Id*. ¶ 11.)

The two PESs that were assigned primarily to the check-in desk – Brittney Bettison, African-American, and Vicki Frye, white – reported to Sanso that Peterson was away from the check-out desk and that she had failed to help them.  (Doc. 25 at 95-96; doc. 24-1 at 62, 64.)  Peterson denies that she ever failed to help the check-in desk when needed.  (Doc. 39-3 ¶ 12.)  Also, she sent an email offering to help others on March 8, 2012, (doc. 27 at 22); however, Sanso testified that she sometimes doesn't get email till a later time, so she preferred that Peterson simply ask her coworkers if they needed help, rather than sending an email, (doc. 25 at 65-66).

Sanso testified that she had "coached" Peterson about the concerns raised by her coworkers and reminded her periodically of the Foundation's expectations regarding customer service, team work, and working overtime.[3]  (Doc. 25 at 74-75, 81-82, 94, 96.)

### 3.  Doctors' Complaints

In early 2012 three doctors in the Dermatology Clinic complained to Sanso about Peterson's job performance, including that (1) she booked patients in the wrong appointment slots, (2) she was unable to answer questions about patient charges, (3) she was staying late, and (4) she displayed a negative attitude and negative body language when they asked her questions.  (Doc. 25 at 88-93.)  Sanso testified that she had talked with Peterson about all of these issues as part of her day-to-day coaching discussions with employees.  (*Id.*)  Peterson testified that the only complaint she received from the doctors was a complaint about scheduling that applied to everyone.  (Doc. 39-3 ¶ 14.)

---

[3]Peterson testified that she was not told of complaints about her work or given an opportunity to address complaints against her before the meeting on May 18, 2012, discussed *infra.*  (*See* doc. 39-3 ¶ 18.)  However, in her deposition, Peterson testified that during this time period she "was ***constantly*** called into [Sanso's] office about someone saying this or someone saying that."  (Doc. 24-1 at 61.)

9

### 4. First HIPAA[4] Violation

On April 27, 2012, Peterson gave one patient [hereinafter "Patient A"] the depart summary of another patient [hereinafter "Patient B"].  (Doc. 24-1 at 55-60; doc. 34 ¶ 3.) According to Peterson, Patient A had given her the charge ticket for Patient B.  (Doc. 24-1 at 57-58.)  During the check-out process, she had called Patient A by Patient B's name, to which Patient A had responded without correcting her.  (*Id.* at 57.)  The error was discovered sometime later when Goodwin brought Patient B to the check-out desk, looking for his/her charge ticket.  (Doc. 39-3 ¶ 17; doc. 33 ¶¶ 11-12; doc. 24-1 at 56-57.)

Sanso investigated the incident. (Doc. 33 ¶ 10.)  She testified that her investigation showed that Dr. Elmet discovered he had Patient A's charge ticket for Patient B, his patient.  (*Id.* ¶ 11.)  He gave Patient A's charge ticket to Goodwin and asked her to find Patient B's charge ticket.  (Doc. 33 ¶ 11.)  Goodwin asked Peterson about Patient B's charge ticket and Peterson told her that she had checked out Patient B.  (*Id.* ¶ 12.)  Sanso determined that Peterson had failed to confirm Patient A's name and his/her birthday at check-out, and she

---

[4]"HIPAA [Health Insurance Portability and Accountability Act] generally provides for confidentiality of medical records and governs the use and disclosure of protected health information by covered entities that have access to that information and that conduct certain electronic health care transactions." *Sneed v. Pan American Hosp.*, 370 Fed. Appx. 47, 50 (11th Cir. 2010)(citing 45 C.F.R. § 164.502).  Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it.  ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***."  11th Cir. R. 36-2 (emphasis added).

had not compared the name on Patient A's check and driver's license with the name on his/her charge ticket. (*Id*. ¶ 13.)

Sanso testified that she could not determine how the charge tickets were switched in the first place. (*Id*. ¶ 14.) Peterson testified that she believed Goodwin had given Patient B's charge ticket to Patient A, but she did not see Goodwin give Patient A the wrong charge ticket. (Doc. 24-1 at 100.) During the course of Sanso's investigation, Peterson advised her that she had received the wrong charge ticket directly from Patient A and that another doctor had signed that charge ticket, which had Dr. Elmet's name at the top. (Doc. 39-3 ¶¶ 15, 16.)

Sanso determined that Peterson had failed to confirm Patient A's name and date of birth when she checked him/her out and that she had failed to confirm that the name on his/her check and his/her driver's license was the same as the name on the depart summary. (Doc. 33 ¶ 13.) Peterson does not dispute that she failed to verify Patient A's birthday and/or compare the name on his/her check and driver's license with the name on the charge ticket. She states only that she called Patient A by Patient B's name and he/she did not correct her. (Doc. 38 at 8 [citing doc. 39-3 ¶ 14].) According to Sanso, verifying the patient's name and date of birth and checking the driver's license for a personal check are all part of the regular protocol for check-out. (*Id*.) Sanso testified that she concluded that Peterson had not properly verified Patient A's identity causing her to give him/her Patient B's depart summary. (*Id*. ¶ 14.)

11

Also, Sanso testified that her investigation did not identify any other employee who had improperly disclosed patient information.  (Doc. 25 at 111-13.)  Nevertheless, she arranged for additional education on patient confidentiality compliance for all clinic employees, and she documented the HIPAA/privacy violation in the files of all the clinic employees that had encountered Patients A or B that day – including Goodwin, white, Bettison, African-American and LaShundra Turner, African-American.  (Doc. 33 ¶ 19; doc. 34 ¶ 5; *see* doc. 28 at 11.)

Following her investigation, Sanso contacted Jeannie Singer, the Director of Sourcing and Workforce Development in Human Resources [HR], to report the patient confidentiality breach.  (Doc. 33 ¶ 15; Doc. 35 ¶¶ 1, 2.)  Singer told Sanso to talk to Jann Robinson, HIPAA Privacy Coordinator.  (Doc. 33 ¶ 15.)  Generally, violations of patient confidentiality are referred to Robinson for a determination of the level of the violation and whether it is a reportable incident.  (Doc. 34 ¶ 2; Doc. 35 ¶ 3.)  Sanso contacted Robinson, who confirmed that Peterson's disclosure of the wrong depart summary was an incidental, as opposed to an intentional, violation of the Foundation's policy on use and disclosure of health information and HIPAA.  (Doc. 33 ¶ 16;  34 ¶ 3.)  Singer and Sanso decided not to terminate Peterson based on the incidental violation; rather, they decided to address the HIPAA/privacy violation together with other performance issues.  (Doc. 33 ¶ 17; doc. 35 ¶ 4.)

12

## E.  WRITTEN WARNING OF MAY 18, 2012

On May 18, 2012, Sanso met with Peterson and gave her a written warning [hereinafter "the May 18 Warning"].  (Doc. 33 ¶ 20; doc. 24-1 at 44.)  The May 18 Warning stated, "This disciplinary action is being taken for the following reason[s]: Job Performance [and] Behavior."  (Doc. 29 at 4.)  Under the heading, "Facts of Occurrence(s)," the May 18 Warning noted:

> Received complaints from staff for concerns related to teamwork, customer service, overtime accrual and abuse, personal phone calls, productivity, and noncompliance with booking preferences of providers.  Also had an incident where patient information was given to the wrong patient at discharge including the depart summary and payment receipt by Sarah [Peterson].  An action plan is attached outlining more in-depth accounts of these concerns and actions taken by Sarah to demonstrate improvement in performance/behavior. Failure to demonstrate improvement in performance/behavior will result in further disciplinary action up to and possibly including termination.

(*Id.*)  The "action plan" attached to the May 18 Warning stated:

> 1. *Teamwork* – concerns relate to lack of initiative with assisting other PES personnel and negative nonverbal communication
>
> ACTION PLAN:  Sarah will frequently (1) check on coworkers to determine any assistance needed and assist these individuals when lines are forming to keep clinic flow efficient[,] (2) ask coworkers if they need any assistance throughout the day[, and] (3) . . . refrain from negative nonverbal and verbal expressions at all times.
>
> 2. *Customer Service* – concerns relate to inappropriate tone, communication, lack of acknowledgement [sic], and negative nonverbal expression.
>
> ACTION PLAN:   Sarah will (1) exhibit professional and positive communication with customers at all times[,] (2) exhibit AIDET principles at all times including the 10 foot rule and acknowledging patients with eye

13

contact, verbal affirmation, pleasant expression, and tone and (3) will attend Essential People Skills class.

3. *Patient Identification* – concerns relate to lack of verification of patient identity prior to distributing patient information.

ACTION PLAN: Sarah will (1) review patient identification policies, HIPAA law, and penalties[,] (2) serve on an action team to assist in educating staff on risk management principles[,] and (3) actively verify patient identity prior to giving patient information at all times.

4. *Overtime Accrual* – concerns relate to overtime accrual and productivity with frequent personal phone calls and breaks while on overtime.[5]

ACTION PLAN: Sarah will (1) continue altered hours assigned to check out personnel for early/late weeks[,] refrain from taking frequent breaks, personal phone call while in the patient care area unless an emergency (only take on breaks and in non-patient care areas)[,] (3) be proactive throughout the day to accomplish PES duties by multi-tasking and carry out non-emergent duties as needed[,] and (4) obtain approval for any overtime PRIOR to accrual by Cheryl [Goodwin] or [Sanso].

(Doc. 29 at 5-6 [footnote added].)  Sanso and Plaintiff discussed each of the action plan

areas, as well as specific improvement goals. (Doc. 24-1 at 45-53; *see* doc. 29 at 6.)

---

[5]In her Opposition Brief, Peterson states, "Plaintiff disputes that her productivity suffered during the first quarter of 2012 except to the extent that she had to be off for physical therapy for her workers' compensation injury.  The fact that Plaintiff was written up in part for 'productivity' in May of 2012 **could only** have referred to her absences and slowed performance due to her workers' compensation injury, i.e., her rotator cuff tear." (Doc. 38 at 16 [citing doc. 39-3 ¶¶ 18, 31][emphasis in original].)  However, the paragraphs of her Declaration that she cites do not support a finding that her productivity suffered in the first quarter of 2012 or at any time thereafter because of her shoulder injury.  (*See* doc. 39-3 ¶ 18 [". . . I deny that I was lacking in . . . productivity . . . ."]; *id.* ¶ 31 ["There were times in 2012 that I had to be absent or leave early to go doctor appointments or physical therapy."].)

In the Employee Comments section, Peterson wrote, "I do not agree with this Written Warning because there was never a verbal warning.  Also this [has] no merit[;] it is hearsay.  I am put in a hostile environment, and no matter how well I perform [there] will be no change."  (Doc. 29 at 4.)  Peterson testified that she felt she was in a "hostile environment" because she "was constantly called into [Sanso's] office about someone saying this or someone saying that," and "it seemed like [she] was a bother to [Sanso] and [Sanso] was rude."  (Doc. 24-1 at 61, 65.)  Despite her testimony that she was constantly called into Sanso's office, she testified that, prior to May 18, 2012, she "was not previously coached by Ms. Sanso regarding the items in the May 18, 2012, write-up."  (Doc. 39-3 ¶ 18.)  She denies "that she was lacking in teamwork, productivity, [and] non-compliance with provider preferences," and that she "abused overtime."  (*Id.*)

## F.  MEETINGS WITH WILSON ON MAY 21, 2012 AND MAY 22, 2012

A few days after the May 18 Warning, Peterson went to HR to complain that no other employees had been disciplined for the patient confidentiality violation.[6]  (Doc. 24-1 at 121-23.)  On May 21, 2012, Joan Wilson, African-American HR Generalist, met with Peterson about her complaint.  (Doc. 36 ¶¶ 1, 3; doc. 24-1 at 121-22.)  Wilson had never met Peterson before this meeting.  (Doc. 36 ¶ 3.)  During this meeting, Wilson told Peterson that she could have been terminated for her patient confidentiality violation; she told Peterson,

---

[6]Sanso testified that she documented the HIPAA violation in the files of all employees that encountered Patients A or B that day.  Also, the May 18 Warning was the result of other conduct in addition to the HIPAA violation.

"You should be happy that [Sanso] didn't fire you because of a HIPAA violation." (Doc. 24-1 at 123.) Peterson told Wilson that Sanso was a "racist" because she was "constantly writing up the black people, and she never writes up the white people." (Doc. 24-1 at 124-26; *see also* doc. 36 ¶ 3.) Wilson suggested that they meet with Sanso to discuss Peterson's concerns and Peterson agreed. (Doc. 24-1 at 125; doc. 36 ¶ 4.)

Peterson, Wilson, and Sanso met on May 22, 2012, and discussed the May 18 Warning and Peterson's working relationship with Sanso. (Doc. 24-1 at 145; doc. 36 ¶ 5; *see* doc. 29 at 9.) Wilson told Sanso that Peterson had called her racist, a fact that Peterson thought Wilson would keep confidential. (Doc. 24-1 at 139.) Peterson stated that she felt Sanso treated white employees better than African-American employees and that Sanso considered African-American employees to be "a problem". (Doc. 36 ¶ 5; doc. 24-1 at 140, 145-46; doc. 29 at 9.) Sanso replied that said she hated that Peterson felt that way, that she did not feel that way about the employees, and that she would be more aware of the way she communicated in the future. (Doc. 24-1 at 140, 145-46; doc. 36 ¶ 5.) Wilson felt this meeting was successful and she was "hopeful that [Peterson would] receive the admonishments and improve her performance." (Doc. 36 ¶ 6; *see* doc. 29 at 9.)

## G. SECOND HIPAA VIOLATION AND FINAL WARNING

On or about May 24, 2012, Sanso learned of a second patient confidentiality violation involving Peterson.[7] (Doc. 25 at 117-18; doc. 26 at 203-05; *see* doc. 27 at 1.) On that day,

---

[7]Peterson testified that she believed Sanso knew about this violation before issuing

a patient's father had contacted Dr. Rosenthal, Chief of Staff, to complain that his son (the patient) had received another patient's depart summary when he left the Dermatology Clinic. (Doc. 32 ¶ 7.)  Dr. Rosenthal notified Pardue, who contacted Sanso and Robinson.  (*Id*. ¶¶ 7, 8.)

Sanso investigated the incident and discovered that, on May 16, 2012, Peterson had failed to verify the patient's name and date of birth and that she had given the wrong depart summary to a patient.  (Doc. 25 at 117-20; doc. 24-1 at 95-97.)  In her deposition, Peterson testified that she did not know what happened that day or even if she had given the patient the wrong depart summary.  (*See* doc. 24-1 at 95-96.)  However, in her Declaration, she testified, "I recall that the reason for the HIPAA violation on May 16, 2012, was that the patient who was checking out had a name that was extremely similar to another name in the system."[8]  (Doc. 39-3 ¶ 19.)  She does not dispute the fact that she failed to verify the

_____

the May 18 Warning, (doc. 24-1 at 93-94), and that, for discriminatory and retaliatory reasons, Sanso had decided to issue two separate warnings in order to issue Peterson a Final Warning, (doc. 24-2 at 261-64).  However, Peterson has presented no evidence that Sanso knew of the second violation before **May 18, 2012**.  (*See id* at 261-62.)  Indeed, it appears no one was aware of the violation before the patient's father complained to Dr. Rosenthal on **May 24, 2012**.  Peterson argues that Sanso learned about this second violation on **May 21, 2012**, the day before Sanso met with Peterson and Wilson, based on the Final Warning, wherein Sanso states that she was aware of the mistake on May 21, 2012.  (Doc. 25 at 117; doc. 27 at 41.)  Sanso testified that this date was a mistake and that she first learned about the second violation in an email dated May 24, 2012.  (Doc. 26 at 205; doc. 27 at 1.)  However, nothing in the record indicates that Sanso was aware of Peterson's second HIPAA violation before May 18, 2012.

[8]The patient checking out and the patient named on the depart summary had the same last name.  (Doc. 24-1 at 95.)

patient's name and birthday before handing him/her the depart summary.   Robinson

confirmed that the disclosure of one patient's depart summary to another patient was an

incidental violation of the Foundation's patient confidentiality policy.  (Doc. 34 ¶ 6.)

As a result of this May 16, 2012, incident, Peterson received a Final Warning on June

4, 2012.  (Doc. 24-1 at 92-94; doc. 29 at 8.)  This Final Warning stated:

> Facts of Occurrence(s):  Per out verbal discussion 5/31/12, I received a
> complaint on May 21 and documentation regarding an incidental disclosure of
> a patient's depart summary to another patient by Sarah during check out of the
> patient on 5/16/12.  This is the second offense of this nature.  . . .  Both
> patients involved have been notified of the incident and all information
> inappropriately disclosed has been obtained.
>
> Previous warning date(s):
> For this same offense:        Written Warning 5/18/12 included an incidental
>                               disclosure surrounding a depart summary and
>                               failure to validate patient identity with receipt of
>                               a check
> For other offense(s):         Verbal Discussion by Kim Turnley (Director) for
>                               teamwork/workload concerns with coworker,
>                               Written Warning for multiple behavior and job
>                               performance concerns 5/18/12
>
> Follow-up, if applicable:  As discussed previously via verbal discussions
> during the account of the first incident, review of the written warning, and
> verbal discussion of the second incident, Sarah will actively verify patient
> name and date of birth.  In addition, Sarah has vocalized she will lay
> out/review all paperwork at check out to double check patient identification
> and information to ensure verification and prevent incidental disclosures.  The
> action plan surrounding the written warning will also remain in effect which
> includes Sarah reviewing the importance of HIPAA regulation and privacy
> parameters in the Dermatology setting.

(Doc. 29 at 8.)

## H.  GAMBLE'S HIPAA VIOLATION

On June 5, 2012, Gamble was written up for a HIPAA violation.  (Doc. 25 at 136.) Gamble's violation involved stapling together the depart summaries for two different patients and giving them to the first patient.  (*Id*. at 137.)  The two depart summaries were printed at the same time to the same printer.  (*Id*.)  Gamble picked up a stack of paper from the printer and stapled them together without verifying that all the pages in the stack of papers were for the same patient.  (*Id*.)  Sanso determined that Gamble had verified the patient's name and date of birth before handing him/her the stack of papers, but she had failed to check the stack of papers. (Doc. 26 at 206-07.)  Peterson testified that she told Sanso that she had asked Gamble if she had papers belonging to the patient Peterson was checking out.  (Doc. 39-3 ¶ 20.)  Gamble simply said, "no," and did not check the stack of papers before handing them to the patient.  (*Id*.)  Gamble received a verbal warning because, according to Sanso, Gamble had verified the patient's identity consistent with protocol.  (Doc. 25 at 136-37; doc. 26 at 206-07; doc. 33 ¶ 22.)

Peterson contends that Gamble should have received the same discipline as she did – written warning and final warning.  (*See* doc. 39-3 ¶ 20.)  However, Peterson's May 18 Warning included issues other than a single HIPAA violation, (*see* doc. 29 at 4-6), and the Final Warning was Peterson's second HIPAA violation caused by her second failure to verify the patient's name and birthday, (*see* doc. 29 at 8).

## I.  PETERSON'S EEOC CHARGE

On June 27, 2012, Peterson filed a Charge of Discrimination with the EEOC, alleging

race and retaliation.  (*See* doc. 1-1.)  In this Charge, Peterson stated:

> My race is Black.  . . .  I perform my duties in a satisfactory manner.  Erika
> Sanso, White, has been my immediate supervisor since November 2011.  Prior
> to her becoming my supervisor, I had no problems.  On May 18, 2012, I
> received a written warning from Ms. Sanso for checking out a patient who had
> the wrong chart.  The incorrect [chart] was given to the patient by Cheryl
> Goodwin, White.  Ms. Goodwin was not issued a disciplinary action.  I asked
> Ms. Sanso about Ms. Goodwin being disciplined and she told me it was not my
> concern.  Prior to my written warning I sent Ms. Sanso's supervisor Towana
> Pardue an email telling her I thought Ms. Sanso was talking to Whites better
> than Blacks and that she was creating [a] hostile work environment.  On June
> 08, 2012, Aubrey Gamble, White, gave a patient someone else's information
> and no action was taken against her.  Whites under Ms. Sanso's supervision
> take breaks, however, when I take a break I'm called into the office by Ms.
> Sanso.
>
> I believe I was disciplined because of my race and in retaliation for
> complaining of a hostile environment in violation of Title VII . . . .

(*Id*.)  She did not mention the Final Warning.  (*See id*.)

## J.  PETERSON'S SHOULDER SURGERY AND SUBSEQUENT LIGHT DUTY

Between June 19, 2012, and July 5, 2012, Peterson had surgery on her shoulder and

was on leave.  (Doc. 24-1 at 142-44.)  Following her leave, she returned to work with a note

from her doctor releasing her to normal duties, provided that she could keep her left arm in

a sling.  (Doc. 25 at 124; doc. 33 ¶ 23; doc. 33-1 at 2.)  On or about August 1, 2012, Peterson

gave Sanso a note from a different doctor, limiting her to light duty.  (Doc. 33 ¶ 24; doc. 33-1

at 3.)  Sanso accommodated the restrictions, and, on August 6, 2012, she gave Peterson a

memo outlining her light duty responsibilities.  (Doc. 25 at 124; doc. 27 at 43.)   Peterson

remained on light duty until October 2012.  (Doc. 24-1 at 165.)

## K.  PETERSON'S COMPLAINTS ABOUT A HOSTILE WORK ENVIRONMENT AND MEETINGS TO ADDRESS CONFLICTS WITH COWORKERS

On August 22, 2012, Peterson sent an email to Sanso complaining that Tracey Foster,

an African-American CMA, was rude to her and she felt she was working in a hostile

environment.  (*See* doc. 30 at 4; doc. 24-1 at 169, 173.)  Peterson did not specify that she

believed the hostility was based on her race, her prior protected activity, or her worker's

compensation claim.  (*See* doc. 30 ¶ 4.)  Two days later she met with Sanso and Wilson to

discuss her concerns.  (Doc. 24-1 at 177-78; *see* doc. 30 at 5.)

When asked by Sanso and Wilson what she meant by a "hostile environment,"

Peterson told Sanso "that she felt everyone was being rude, [and] that she was disliked.  She

felt that it was a challenge at times to do her job."  (Doc. 25 at 132.)  During this meeting,

Peterson raised several other issues concerning her relationships with her coworkers,

including:

1.  A person in housekeeping said[,] "Sarah are you still here?  All your stuff is gone from your work area, all your pictures are down."  Why would the housekeeping person say that and why did someone move my stuff?

2.  I was treated poorly when I returned from leave.

3.  One day I paged my workman's [compensation] doctor because I was having problems with my arm and I told everyone in my area that I had paged his office.  When I didn't get a call back for three days, I called

his office and was told that they had called and talked to someone in my office – no one ever told me that.

4. The phone code was changed and I did not know the new code[.]  I asked Aubrey [Gamble] if she changed it and she said that she did not change it.  I called the Help Desk and they said the code had been changed by Aubrey.  . . .

5. The deposit code was changed and no one was willing to give me the correct number.  . . .

6. I went into medical records area and [LaShundra Turner] was sitting in the place I usually sit.  I asked her to move and I heard [LaShundra] say "that's why I cannot stand that bald headed [bitch]."

7. Erika [Sanso told] me to communicate with others, but no one is communicating with me.

(Doc. 30 at 5 [Wilson's notes memorializing the meeting with Sanso and Peterson]; *see* doc. 24-1 at 178 [Peterson testified that Wilson's summary was accurate].)  In response to these concerns, Sanso suggested that she and Wilson facilitate one-on-one meetings between Peterson and her coworkers and Peterson agreed.  (Doc. 36 ¶ 8; doc. 24-1 at 190; doc. 30 at 5; doc. 39-3 ¶ 3.)

On September 5, 2012, Sanso, Wilson, and Peterson met with Foster, Turner, and Gamble, as well as Ashley Wells, a white employee in the Call Center, and Laura Puckett, a white employee in Medical Records.  (Doc. 24-1 at 175-77, 191-94, 196-97, 199, doc. 24-2 at 201-02; *see* doc. 30 at 6.)   According to Wilson and Sanso, Peterson raised her concerns with her coworkers about how they were treating her and some of the coworkers, specifically Turner and Gamble, voiced concerns about how Peterson treated them.  (Doc. 36 ¶¶ 10-11;

22

doc. 33 ¶ 28.)  Gamble stated that she did not like Peterson because she reported people to

HR and because she had filed a lawsuit against the Foundation.[9]  (*See* doc. 30 at 6.)  Turner

denied calling Peterson a "bald-headed bitch," but she admitted that she did not like Peterson.

(Doc. 24-1 at 197-98.)

After the individual meetings, Sanso and Wilson pointed out to Peterson that she

appeared to be the "common denominator" in the conflicts among her coworkers.  (Doc. 33

¶ 30; doc. 36 ¶ 12.)  However, they testified that, after these meetings, they were hopeful that

Peterson would improve her communication with her coworkers and would be more sensitive

to how she came across to others.  (Doc. 33 ¶ 30; doc. 36 ¶ 12.)

## L.  PETERSON'S ISSUE WITH GAMBLE IN OCTOBER 2012

According to Sanso, after the September 5, 2012, meetings, the issues between

Peterson and her coworkers appeared to improve for a time.  (Doc. 33 ¶ 31.)  However,

Peterson testified, "After I had returned from having surgery, . . . Ms. Gamble's attitude had

changed toward me. . . . She would change the passwords and codes and this would prevent

me from doing my job.  She did not leave any code on a sticky note for me."  (Doc. 39-3 ¶

21.)  On October 10, 2012, Peterson emailed Sanso complaining that Gamble had changed

the telephone code at the check-out desk without telling her the new code; she complained

to Sanso that "nothing has change[d] since the [September 5] meeting."  (Doc. 25 at 137-38;

---

[9]At this time, Peterson had not filed a lawsuit against the Foundation, although her
EEOC Charge was pending.

doc. 27 at 46.)  Sanso investigated Peterson's complaint and she determined that Gamble had put the new telephone code on a sticky note at the check-out desk, which was the appropriate procedure.  (Doc. 25 at 130.)  She testified that she had been unable to determine whether Gamble was otherwise appropriately communicating with Peterson, but she coached Gamble to be more aware in her interactions with Peterson.  (Doc. 33 ¶ 31.)

Shortly after the September meetings, Gamble was promoted to a position in the Call Center, a position for which Peterson had also applied.  (Doc. 39-3 ¶ 34.)  Peterson has not raised a claim based on her failure to be promoted to the Call Center position.

## M.  PETERSON'S 2012 EVALUATION

Peterson received her yearly evaluation from Sanso on October 30, 2012.  (*See* doc. 30 at 9-12.)  Sanso rated Peterson as "meet[ing] some expectations," which means that the employee "[g]enerally did not meet criteria relative to quantity and quality of job performance/behavior required," on all four of the Foundation's core values – "Integrity (Do Right)," "Ownership (Own It)," "Caring (Always Care)," and "Collaboration (Work Together)" – and on four out of nine applicable job responsibilities.  (*See id*. at 9-10; doc. 33 ¶ 33.)

Under the core value of "Integrity," Sanso noted that Peterson had been disciplined for overtime, personal phone calls, communication problems, customer complaints, and work concerns.  (Doc. 30 at 9.)  Peterson indicated that she believed her performance in this area had "exceeded some expectations."  (*Id*.)

24

Under the core value of "Ownership," Sanso noted that Peterson had multiple entry errors and HIPAA violations. (*Id*.) Peterson indicated that she believed her performance in this area had "exceeded some expectations." (*Id*.)

Under the core value of "Caring," Sanso noted that Peterson "usually" related well to patients but that she had concerns about team work and Peterson's negative comments to coworkers. (*Id*.) She also noted that Peterson complained and that she had spent "a great deal of [her] time . . . mediating conflicts with coworkers." (*Id*.) Peterson indicated that she believed her performance in this area had "met expectations." (*Id*.)

Finally, under the core value of "Collaboration," Sanso noted that Peterson had been disciplined for "team work concerns," and she repeated that she had spent time mediating conflict between Peterson and her coworkers. (*Id*. at 9-10.) She stated that Peterson needed to respect her coworkers and improve her communication, although she noted that Peterson had participated in training new individuals. (*Id*.) Peterson indicated that she believed her performance in this area had "exceeded some expectations." (*Id*. at 9.)

Peterson's evaluation states the following with regard to those job responsibilities for which Sanso rated Peterson as "Met Some Expectations." With regard to "Checks patients out of the clinic after their visit" job responsibility, Sanso noted that Peterson had HIPAA violations as a result of her failure to verify patient information. (*Id*, at 10.) Peterson indicated that she believed her performance of this job responsibility "exceeded some expectations." (*Id*.)

25

With regard to "accurately completes tasks related to patient financial responsibilities" of the clinic after their visit" job responsibility, Sanso noted that "We did have some circumstances arise where inaccurate billing measures occurred for which [Peterson] reviewed and was unsure of what happened[,] which resulted in further training."  (*Id.*) Peterson indicated that she believed her performance of this job responsibility "met some expectations."  (*Id.*)

With regard to "schedule patient appointments" job responsibility, Sanso noted that she had complaints of patients arriving for appointments at the wrong time or on the wrong day because Peterson had put a different time/date on the depart summary than on the computer schedule.  (*Id.*)  Peterson indicated that she believed her performance of this job responsibility "exceeded some expectations."  (*Id.*)

With regard to "financial and billing responsibilities" job responsibility, Sanso noted that Peterson had "payments [that] were not accounted for appropriately resulting in financial loss to the institution and further training."  (*Id.* at 11.)  Peterson indicated that she believed her performance of this job responsibility "exceeded expectations."  (*Id.*)

During this same time period, Sanso gave Gamble an excellent evaluation.  (Doc. 25 at 145; doc. 28 at 1-4.)

## N.  DECEMBER 2012 PATIENT COMPLAINT

In December 2012, a patient had complained she was "disappointed and offended" when Peterson "rudely" told her to "step back for privacy."  (Doc. 28 at 49-50.)  The patient

reported that Peterson was very rude and that other patients had commented about it.  (*Id*. at 50.)  Peterson denied she was rude to a patient.  (Doc. 24-2 at 229.)  She testified that, during this time period, she "kindly" told several patients, "Would you please step back for privacy?," when one patient was standing too close to the patient at the desk.  (*Id*.)  She does not know if any patient complained and, if so, such complaint was not brought to her attention at the time.  (*Id*. at 229-30.)

In her Declaration, Peterson testified:

> 37.  Patient complaints were made about white employees that were brought to Erika Sanso's attention.  On one occasion, I witnessed a black female patient in tears.  The patient was upset about the way that Vicki Frye, white, check-in desk worker, had treated her.  I reported this information to Erika Sanso and the patient spoke to Sanso about it.

> 38.  In October of 2012, when Aubrey [Gamble] was working in check-out, a daughter and her mother started to be checked out by Aubrey, and Aubrey treated them in an unprofessional manner.  The daughter brought her mother to my workstation and she said that she did not want to be checked out by the white woman, pointing to Aubrey.  I informed Erika Sanso of this incident.

(Doc. 39-3 ¶¶ 37-38.)

## O.  EEOC ON-SITE INVESTIGATION

The EEOC Conducted an on-site investigation on December 10, 2012.  (Doc. 25 at 148-49.)  During their visit, employees from the EEOC questioned a number of Foundation employees, including Sanso.  (*Id*.)  Sanso told the EEOC investigator that she had no concerns about Peterson's teamwork at that time.  (*Id*. at 149.)  The record contains no evidence that Peterson participated in the on-site investigation.

## P.  CARTER'S COMPLAINTS

Following the EEOC's on-site visit, Ashley Carter, African-American PES who replaced Gamble at the check-out desk, complained about Peterson's behavior.  (Doc. 24-1 at 188; doc. 25 at 29; doc. 33 ¶ 34.)  According to Sanso, Carter came to her in tears and said she was considering quitting.  (Doc. 33 ¶ 34.)  Carter's complaints to Sanso and Peterson's responses were:

> • Peterson took personal phone calls at the check-out desk, (doc. 33 ¶ 34); Peterson denied her personal phone calls interfered with her work, (doc. 39-3 ¶ 24).

> • Peterson gave Carter her charge tickets to enter rather than entering them herself, (doc. 33 ¶ 34), which Peterson denied, (doc. 39-3 ¶ 24).

> • Peterson talked with her son, who routinely stopped by the check-out desk, which backlogged patients in line for check-out.  (Doc. 33 ¶ 34.)  Peterson denied her son frequently stopped by the check-out desk and/or that she talked to him while patients waited.  (Doc. 39-3 ¶ 24.)

> • Peterson spent a lot of time addressing missing charge tickets or outstanding items rather than having her desk open to check-out patients, (doc. 33 ¶ 34), which Peterson denied, (doc. 39-3 ¶ 24).

> • Peterson did not assist in calling Dr. Kissel's patients, although this was supposed to be a shared responsibility, (doc. 33 ¶ 34), which Peterson denied, (doc. 39-3 ¶ 24).

> • Peterson was rude to patients and took too many breaks, even when several patients were in line, (doc. 33 ¶ 34), which Peterson denied, (doc. 39-3 ¶ 24).

Sanso reported Carter's concerns to Singer in an email dated December 14, 2012.  (Doc. 33 ¶ 34.)  Peterson testified that Sanso did not tell her about Carter's complaints in December 2012.  (Doc. 39-3 ¶ 24.)

28

## Q.  RIGHT TO SUE LETTER

The EEOC issued Peterson a right to sue letter on her EEOC Charge on January 2, 2013.  (Doc. 16-3.)

## R.  JANUARY 4, 2013 – RETURNED CHECK

On January 4, 2013, the Patient Ambulatory Access Department reported that Peterson had failed to obtain a patient's driver's license information, as required by the Foundation's check verification protocol.  (Doc. 33 ¶ 35.)  The Foundation's agreement with its check-processing company does not cover returned checks without the proper identification information.  Therefore, the Foundation was financially responsible for the returned check, which did not contain the patient's driver's license information.  (Doc. 33 ¶ 35.)  On January 10, 2013, Sanso also discovered that Peterson had accepted three checks for which she had failed to obtain the requisite identification information.  (Doc. 33 ¶ 37.)

Peterson testified that she had no control over whether a check was returned.  (Doc. 39-3 ¶ 25.)  She also testified that she was aware that the Foundation's policy required her to write a telephone number and driver's license number on the face of each check.  (*Id*.)  However, she does not dispute that she failed to record the patient's driver's license information on the returned check, which made the Foundation – and not the check-processing company – responsible for the unpaid check, and she does not dispute that Sanso found she had accepted three other checks without the required driver's license information.

## S. CARTER'S ADDITIONAL COMPLAINTS AND PETERSON'S MEETING WITH WILSON AND SANSO

On January 9, 2013, Carter complained again to Sanso about Peterson leaving the check-out desk for approximately fifteen minutes at a time other than her break, while a line of eight to ten people waited at the check-out desk. (Doc. 33 ¶ 36; doc. 33-1 at 9.) Peterson denied that she was away for fifteen minutes, but she did not deny that Carter made such a complaint. (*See* doc. 39-3 ¶ 26.) Sanso met with Wilson for guidance on handling Carter and Peterson's conflict and Peterson's continuing behavioral and performance issues, including leaving the check-out desk. (Doc. 33 ¶ 38; doc. 36 ¶ 14; *see also id*., exh. E, at 16.)

The following day, Carter complained to Sanso that she was carrying a heavier load than Peterson, and she pointed to the number of charges she had entered on January 9th and 10th as compared to Peterson. (Doc. 33 ¶ 37.) After comparing their entries, Sanso determined that Carter appeared to be processing significantly more payments and money items than Peterson. (Doc. 33 ¶ 37.) Peterson testified that, on January 8, 2013, Carter told her that she had been told that Peterson was to do all precertifications. (Doc. 39-3 ¶ 27.) She told Sanso that she had spent "a great deal of time" doing the precertifications on January 9th and 10th. (*Id*.)

On January 11, 2013, Sanso and Wilson, along with Annalee Hudson, a white HR Generalist, met with Peterson and Carter to discuss their interpersonal conflicts. (Doc. 24-2 at 225; doc. 33 ¶ 39; doc. 36 ¶ 15.) Following this discussion, and after Carter had left the meeting, Sanso told Peterson that she had previously addressed teamwork and

communications concerns with her and she had not seen Peterson change her behavior. (Doc. 24-2 at 225-26; doc. 36 ¶ 15; doc. 33 ¶ 39.)  Peterson stated that when she raised a concern about her coworkers, Wilson (African-American) and Sanso did not believe her and they always believed the other employee.  (Doc. 39-3 ¶ 35.)  Wilson told Peterson, again, that she was the common denominator in the interpersonal conflicts with coworkers and such behavior in the future would not be tolerated. Wilson told Peterson that this was her last chance.  (Doc. 24-2 at 226-27; doc. 33 ¶ 39; doc. 36 ¶ 15; *see also id*., exh. F, at 18.)  Wilson said, "This is the last time we will talk with you about anything.  The next time, you will be out the door."  (Doc. 24-2 at 226-27.)  Sanso testified that she had considered terminating Peterson at this time because she felt that they had been clear about their expectations and Peterson was unable or unwilling to change her behavior and improve her performance. (Doc. 33 ¶ 40.)

**T.  JANUARY 25, 2013, INCIDENT AND PETERSON'S TERMINATION**

On January 25, 2013, Sanso noticed that two patients were waiting to check-out while Peterson was on duty, but no one was at the check-out desk.  (Doc. 33 ¶ 41; doc. 26 at 167-69; doc. 28 at 51; doc. 39-3 ¶ 36.)  Sanso got the employees at the check-in desk to check-out the patients.  (Doc. 33 ¶ 42.)  According to Sanso, she saw Peterson come out of the restroom ten minutes later.  (*Id*.; doc. 28 at 51.)  Peterson told Sanso that she had been in a hurry to blow her nose, to which Sanso responded that she had tissue at the check-out desk.  (Doc. 33 ¶ 42; doc. 28 at 51 ["When you came back to your desk I asked where you

had been and you told me you had to 'blow your nose'.  I noted you had been gone for about

ten minutes (and that you had tissue at your desk) . . . ."].)  Sanso asked Peterson why she had

not told the check-in staff that she needed to step away, and Peterson told Sanso that no one

was at the check-in desk for her to tell.  (Doc. 33 ¶ 42.)  Peterson testified that she had

followed protocol by looking for a PES in check-in to cover for her, turning off her light, and

leaving a note at the check-out desk when she could not find a PES employee to cover for

her.  (Doc. 39-3 ¶ 36; *see also* doc. 31 at 9.)  Sanso did not believe Peterson because she had

seen the check-in employees  at the check-in desk the entire time Peterson was away.  (Doc.

33 ¶ 42.)

At this point, Sanso decided to terminate Peterson because she felt that Peterson was

not going to improve her performance or her relationships with her coworkers and that

additional disciplinary action would not be effective.  (Doc. 33 ¶ 43)  On January 30, 2013,

Sanso and Wilson met with Peterson and terminated her employment based on her continuing

behavioral and performance issues.  (*Id*. ¶ 44; doc. 36 ¶ 17.)  During this meeting, Sanso gave

Peterson a Memorandum, which set forth Sanso's reasons for Peterson's termination.  (Doc.

31 at 6-9.)  This Memorandum stated:

> Sarah, as a summary of recent discussions, this will serve as written
> notification that you are being terminated from employment at this time based
> on ongoing interpersonal conflicts, patient complaints and job performance.
> Prior disciplinary actions and a summary of the most recent issues are outlined
> below.

BACKGROUND

Since your transfer to Dermatology Clinic on January 3, 2011[,] and prior to my arrival as manager, you received verbal counseling from the former Sr. Director about teamwork and workload/productivity concerns.  Since my arrival as manager, we have addressed your performance or behavior as follows:

May 18, 2012

You were issued a written warning for an incidental disclosure surrounding a depart summary and failure to validate patient identity.  You also received a written warning for concerns related to teamwork, customer service, unauthorized overtime, personal phone calls, productivity and lack of compliance with scheduling preferences of providers.  . . .

. . .

June 4, 2012

You were issued a Final Warning for a second HIPAA patient privacy violation.

September, 2012

As a result of continuing interpersonal working relationship issues in the clinic, we conducted one-on-one meetings and discussions with you and five co-workers in an effort to work through interpersonal relationship conflicts. In those meetings, it was reiterated that you were the common denominator among your coworkers.

October 30, 2012

On your annual performance evaluation for the period October 1, 2011[,] through September 30, 2012, you scored less than satisfactory on all four Core Values . . . and less than satisfactory on four of your key job responsibilities.

CURRENT ISSUES

Patient Complaint

In December 2012, a patient reported that she felt very "disappointed and offended" with you at check out because she was rudely told to "step back for privacy".  The patient was not upset that she was told to step back; she was upset in the way this message was delivered, stating that you were very rude

and when you said it, other patients commented about it when they walked out with her.

Productivity
A review of your work productivity shows consistently lower volume than your co-worker.

| Thursday, January 10th | IDX Payments Posted | Money Items Collected |
|---|---|---|
| | You–15 | You–14 |
| | Co-Worker–33 | Co-Worker–29 |
| | | |
| Wednesday, January 9th | You–20 | You–17 |
| | Co-Worker–32 | Co-worker–25 |

Inequality with workload causes co-worker tension when you are not perceived as being proactive or responsive with your job responsibilities.

Unsatisfactory Job Performance/Failure to Follow Job Protocol
In December we received a report from the Patient Access Office indicating there was a returned check for which you did not obtain the required information, which means we may incur financial loss from services rendered. During my January review of cash batches and receipts, I found three (3) additional returned checks for which you did not obtain the required information. This may result in a financial loss for the clinic if payment is not received. You are well aware of the protocol to obtain specific information for each check received.

December 11, 2012[10]
Another facilitated discussion occurred with an additional co-worker about interpersonal working relationship issues. We again reiterated the importance of making the patient/customer priority over all other "duties" such as filing, putting in charges, etc. when a patient approached the desk. Your response was, "oh, okay" as if this was [a] new instruction to you. We further emphasized the need to focus on the customer at the desk.

---

[10]This date should be January 10 or 11, 2013. (Doc. 31 at 8 [handwritten note]; doc. 24-2 at 228.)

Sarah, as pointed out during the December 11th discussion, you are the common denominator in the interpersonal conflicts and facilitated discussions with six co-workers in the past 6 months.[11]  We reiterated the need for you to demonstrate different behaviors in order to maintain successful working relationships and to continue your employment in the position.  You indicated your understanding and stated that you would not cause another incident to have another meeting.  It was reiterated that this was the last discussion about the matter and there would be no further warnings.  You indicated your understanding.

January 25, 2013

As you know, in addition to prior discussions and counseling, you just signed updated Staff Expectations in staff meeting on January 18th.  Despite this history of counseling about your teamwork and the need to be more considerate of your coworkers and patients, just last week I observed the following failure to do either.  You were away from your desk for about 10 minutes and had not taken any steps to re-route patients.  Accordingly, I noticed two patients standing at check out with no direction.  When I realized that you were gone, I re-routed the patients to check-in to be helped.  When you came back to your desk I asked where you had been and you told me you had to "blow your nose".[12]  I noted you had been gone for about ten minutes (and that you had tissue at your desk) and also asked why you had not told the check[-]in staff you were stepping away s that they could have helped the patients in your absence.  You said there was no one at the check-in desk to tell.  In fact, I observed that the check-in staff was present, servicing patients the entire time.  I do not know why you would behave this way, leaving our patients with no assistance as well as leaving your work for coworkers.  We have addressed these issues as recently as the December 11th meeting.  Your decision to leave the desk unattended without proper communication is not in

---

[11]The record reflects that Sanso and Wilson had "facilitated discussions" with Peterson and five coworkers in September and with Peterson and Carter in January. Therefore, the six "facilitated discussions" occurred within five months.

[12]Apparently plaintiff went to the bathroom for purposes other than blowing her nose. (Doc. 31 at 9 [handwritten note – "If I had waited would have had an accident on myself."].) She also noted on the Memorandum, "Erika [Sanso] was not in office or anywhere around" and "could not wait to go to bathroom." (*Id.*)  She stated that no patients were waiting at check-out and the she was gone two to three minutes. (*Id.*)

keeping with your commitment to teamwork and customer service that you
made in that meeting.

Given the continuing issues with your behavior and performance, despite
repeated counseling, we are terminating your employment today.  . . .

(Doc. 31 at 6-9 [footnotes added].)

Following Peterson's termination, the Foundation hired two white PESs – Leigh Davis
and Shelby Pierce.  (Doc. 25 att 41, 43-44.)  Pierce primarily worked the check-out desk,
although both she and Davis rotated between the check-in and check-out desks.  (*Id*. at 43,
44.)  Peterson did not file an EEOC charge following her termination.

**U.  UNEMPLOYMENT COMPENSATION HEARING AND DECISION**

Peterson filed for unemployment compensation benefits following her termination.

(Doc. 24-2 at 239.)  The State of Alabama's Department of Industrial Relations [DIR] ruled

in Peterson's favor on her claim.  (Doc. 39-1 at 1.)  Specifically, it found:

The claimant worked for the listed employer from June 3, 1997, until January
30, 2013, as a patient counter specialist.   She was discharged from
employment based upon charges that she disregarded patients and coworkers.
The final incident, which raised a reason for discharge, was that the claimant
had left her workstation to use the restroom.   The procedure is to notify a
coworker if t is necessary to leave the workstation, but at the time the claimant
left there were no employees at check-in.   In such event, the procedure is to
write a note on a pad and turn off the light.   The claimant followed this
procedure. It was necessary that the claimant visited the restroom, because she
[was] suffering from a temporary illness.   She was gone to the restroom less
than three minutes.

(*Id*.)  Based on this finding, DIR concluded:

Section 25-4-78(3)(b) of the Law provides that an individual shall be
disqualified for total or partial unemployment if the individual was discharged

from the most recent bona fide work for actual or threatened misconduct committed in connection with work repeated after previous warning. "Misconduct" is defined as a disregard of the employer's interests or of the standards of behavior which the employer had the right to expect of employees. The employer has [the] right to expect employees will follow reasonable policies and regulations and treat coworkers with fairness and respect and do the same with customers. The final incident resulting in the claimant's discharge does not demonstrate that she did, in fact[,] disregard the standard. Misconduct is not established. Therefore, the claimant is not subject to disqualification under this section of the Law.

(Doc. 39-1 at 1.)

## V.  THE INSTANT ACTION

On April 5, 2013, Peterson filed a Complaint, which was subsequently amended, alleging that the Foundation (1) discriminated against her on the basis of her race in violation of Title VII and § 1981, (2) retaliated against her for complaining of racial discrimination in disciplining her and terminating her employment in violation of Title VII and § 1981, and (3) wrongfully discharged her  in violation of Alabama law in retaliation for her worker's compensation claim.  (*See generally* doc. 1; doc. 16.) The court finds that Peterson has alleged race  discrimination and retaliation claims based on disparate discipline with regard to the May 18 Warning and the Final Warning and with regard to her termination.

# III. <u>DISCUSSION</u>

## A. FEDERAL CLAIMS

### 1. May 18 Warning and Final Warning

The Foundation asks the court to enter a summary judgment on Peterson's race discrimination and retaliation claims brought pursuant to Title VII, 42 U.S.C. §§ 2000e-2, 2000e-3, and 42 U.S.C. § 1981. (*See* doc. 22; doc. 23 at 24-30.) In response, Peterson argues that there are genuine issues of fact with regard to whether she was terminated because of her race or in retaliation for protected activity. (*See* doc. 38 at 23-31.) She does not respond to the Foundation's Motion for Summary Judgment as to her claims based on the May 18 Warning or the Final Warning. Therefore, to the extent Peterson's Complaint and/or Amended Complaints contain race discrimination and retaliation claims based on adverse actions other than her termination, those claims will be dismissed as abandoned. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009)(citing *Johnson v. Board of Regents*, 263 F.3d 1234, 1264 (11th Cir. 2001)); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599-600 (11th Cir. 1995).

### 2. Termination

Because Peterson relies upon circumstantial evidence to prove her termination claims, the court's analysis is governed by the tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).  The Supreme Court has explained this

framework as follows:

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff suffered an adverse employment action for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Id.* at 142-43 (internal citations and quotations omitted).

### a. Race Discrimination Prima Facie Case[13]

The Foundation contends that Peterson's race discrimination termination claims are due to be dismissed because she "cannot establish that [the Foundation] treated similarly situated employees outside the protected category more favorably."  (Doc. 23 at 24.) Peterson argues that she has established her prima facie case by proving she was replaced by a white employee.  (Doc. 38 at 24.)

A plaintiff may  establish a prima facie case of discriminatory discharge by showing (1) she is a member of a protected class, (2) she was qualified for the job, (3) she was terminated, and (4) either she was replaced by someone outside the protected class or she was terminated for misconduct that was "nearly identical to [misconduct] engaged in by [an employee outside the protected class] whom [the employer] retained." *Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004)(citing *Reeves*, 530 U.S. at 142);  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984)(quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982) and citing *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282-84 (1976); *see also Burke-Fowler*, 447 F.3d at 1323 ("When a plaintiff alleges discriminatory discipline, to determine whether

---

[13]The court notes that Peterson's EEOC Charge was filed before her termination and she did not amend her charge or file a new charge following her termination.  Therefore, her Title VII claims based on her termination appear to be barred by her failure to exhaust her administrative remedies.  However, the Foundation has not moved to dismiss Peterson's Title VII claims on this ground and Peterson's failure to file an EEOC charge does not affect her § 1981 claims.

employees are similarly situated, [the court] evaluates 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'")(quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

The parties do not dispute that Peterson can show the first three elements of a prima facie case. Peterson has presented evidence that she was replaced by Shelby Pierce, white. Therefore, the court finds that she has established a prima facie case of race discrimination with regard to her termination.

### 3. Retaliation Prima Facie Case

In order to establish a prima facie case of retaliation in violation of Title VII and Section 1981, Peterson must establish: (1) a statutorily protected expression or activity; (2) an adverse employment action; and (3) a causal relationship between the protected expression and the adverse action. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008). The Foundation contends that Peterson cannot establish the necessary causal connection between any protected activity and her termination. Peterson argues that she can establish the causal link element by proof of "an intervening pattern of antagonism." (Doc. 38 at 29 [citing *Woods v. Bentsen*, 889 F. Supp. 179 (E.D. Pa. 1995)].)

"The causal link element [of the retaliation prima facie case] is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)(quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th

Cir.1998)(quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993)))(internal quotations omitted); *see also McCann*, 526 F.3d at 1376.

According to Peterson, she engaged in protected activity (1) when she complained to Pardue in January 2012, (2) when she complained to Wilson in May 2012, and (3) when she filed an EEOC Charge in June 2012. (Doc. 38 at 28.) Defendant notes that as of the May 18, 2012 warning, the only protected activity in which plaintiff had engaged was her January Complaint to Pardue. (Doc. 23 at 26.) However, there is no evidence that the decision makers with regard to the May 18 warning were aware that plaintiff had engaged in protected activity. Although Sanso was aware of plaintiff's protected activity by the time of the final warning, there is no evidence on which a reasonable jury could find that the final warning was related to the protected activity.

Plaintiff was terminated in January 2013. This gap of six months between the date she filed her EEOC charge and the date of her discharge is too long to support a causal connection based solely on temporal proximity. *See Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010)(citing and quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2008)). "Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.*

She also points to the EEOC on-site investigation as "the trigger for Sanso's renewed campaign against[her]." (Doc. 38 at 31.) Nothing in the record indicates that Peterson

participated in any way in the EEOC on-site investigation.   Therefore, the on-site investigation cannot be considered "protected activity" for purposes of determining a connection between protected activity and adverse action.   *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001)(noting as "utterly implausible" the plaintiff's "suggestion that the EEOC's issuance of a right-to-sue letter – an action in which the employee takes no part – is a protected activity of the employee"); *Gray v. City of Montgomery*, 756 F. Supp. 2d 1339, 1350-51 (M.D. Ala. 2010)(mere pendency of lawsuit is not "protected activity;" noting that a plaintiff could have multiple instances of protected activity at different stages of a lawsuit).

The court finds that Peterson has not established a causal connection between the alleged protected activity and her termination.   Therefore, the court finds that defendant's Motion for Summary Judgment is due to be granted and plaintiff's retaliation claim is due to be dismissed.

 Nevertheless, even if the court assumes a prima facie case of retaliation, Peterson's retaliation claim is due to be dismissed because she cannot establish that the reasons for her termination are a pretext for unlawful retaliation based on her protected activity.

### 4.  Articulated Non-discriminatory Reasons and Pretext

The Foundation contends that Peterson's race discrimination and retaliation claims are due to be dismissed because its "reasons for [her termination] were legitimate business judgments that had nothing to do with race or retaliation."  (Doc. 23 at 28-29.)  Peterson

43

disagrees and argues that she has presented evidence that shows defendant's articulated reasons for her termination are unworthy of credence and that the real reason she was discharged was her race and/or retaliation.  (*See* doc. 38 at 24-31.)

The law in this circuit is well established:  A plaintiff may not establish pretext merely by quarreling with the wisdom of the alleged discriminatory and/or retaliatory decision. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).  "A plaintiff may show pretext by either directly persuading the court that a discriminatory reason motivated the employer, or by indirectly showing that the employer's proffered explanation is unworthy of credence."  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  The relevant inquiry on the issue of pretext is "highly focused" – "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct."  *Combs*, 106 F.3d at 1537-38 (11th Cir. 1997)(citing  *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).[14]  When a defendant offers more than

---

[14]In *Combs*, the Eleventh Circuit held:

In relying on [the comparator's] financial improprieties to undermine [defendant's] explanation that it based its promotion decision on [the comparator's] superior supervisory experience, [plaintiff] confuses *disagreement* about the wisdom of an employer's reason with *disbelief* about the existence of that reason and its application in the circumstances. Reasonable people may *disagree* about whether persons involved in past financial improprieties should be made supervisors, but such potential

one reason for the challenged action, the plaintiff is entitled to survive summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of **each** of the employer's proffered reasons for its challenged action.   *Id*. at 1529(emphasis added); *see also Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007)("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000))).

"To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons [have] no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision."   *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J, concurring)(citations omitted). However, "If the proffered reason is one that might motivate a reasonable employer, a

---

disagreement does not, without more, create a basis to *disbelieve* an employer's explanation that it in fact based its decision on prior non-financial supervisory experience.  [Defendant's] decision to promote [the comparator] instead of [plaintiff] may seem to some to be bad business judgment, and to others to be good business judgment, but federal courts do not sit to second-guess the business judgment of employers.   Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.

*Combs*, 106 F.3d at 1543 (11th Cir. 1997)(emphasis in original).

plaintiff cannot recast the reason but must meet it head on and rebut it." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)). "In other words, it does not matter whether the plaintiff *actually innocent* of the infraction for which the adverse employment action is taken; the only relevant inquiry is whether the employer *believes* he is guilty." *Masso v. Miami-Dade County*, 247 Fed. Appx. 190, 192 (11th Cir. Sept. 6, 2007) (emphasis added). "No matter how medieval [an employer's] practices, no matter how high-handed its decisional process, no matter how mistaken [its] managers, [Title VII and § 1981 do] not interfere. Rather [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman*, 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991))(other citations omitted).

Peterson contends that she "has refuted each and every reason that led to her termination other than the HIPAA violations," and a white employee, Aubrey Gamble, had two HIPAA violations and was not terminated. (Doc. 38 at 24.) However, the court finds the record contains no evidence of disputed issues of material fact sufficient to allow a reasonable jury to find that all of the Foundation's articulated reasons for Peterson's termination are unworthy of credence.

As set forth above, the termination memorandum listed a number "current issues," not including the two HIPAA violations, that were the Foundation's reasons for terminating

Peterson:  (1) leaving check-out desk unattended; (2) continuing "interpersonal working relationship issues" with her coworkers; (3) failing to follow protocol when accepting checks; (4) another patient complaint; and  (5) lack of productivity as compared to her coworker Carter.  (*See* doc. 31 at 7-9.)

### a.  Left Check-Out Desk Unattended

One of the current issues on the termination memorandum was the incident on January 25, 2013, when, according to Sanso, Peterson was "away from [her] desk for 10 minutes and had not taken any steps to re-route patients." (Doc. 31 at 9.)  Sanso noted that Peterson told her that no one was at the check-in desk, but Sanso had "observed that the check-in staff was present." (*Id.*)

In opposition to the Foundation's Motion for Summary Judgment, Peterson argues, State of Alabama Department of Labor Hearings and Appeals Division found that Plaintiff did not violate her employer's standards in the last event that led to her termination, i.e., her leaving her work station to go to the restroom because of a medical condition on January 25, 2013." (Doc. 38 at 25 [citing doc. 39-1].)  As set forth above, the court notes that DIR found Peterson had followed appropriate procedures and was away from her desk for only 3 minutes.  Significantly, it did not find that Sanso made up the incident – she saw Peterson was not at the desk when patients were present and she had not asked any employee at the check-in desk to cover for her.  Although the court credits the facts as found by DIR, these

facts are not sufficient to create a question of fact as to whether or not Peterson's absence

from the check-out desk was one of the reasons Sanso decided to terminate her.

As the Alabama Court of Civil Appeals has held:

> Although a conclusion that an employee committed misconduct necessarily compels the conclusion that a legitimate reason for discharge exists, the reverse is not also true. Because Alabama law does not require that an employer have a "good" reason for discharging an employee, the fact that an employee was not discharged for misconduct does not compel the conclusion that the employer had no valid reason to discharge him or her or that the employer wrongfully discharged the employee. Thus, the conclusion that [plaintiff] had not committed misconduct sufficient to disqualify him from receiving benefits under the unemployment-compensation statute cannot be used to compel the conclusion that [defendant] is unable to proffer [plaintiff's] violation of the attendance, bereavement-leave, and serious-misconduct policies as legitimate reasons for [plaintiff's] discharge. That is, even if [plaintiff's] violation of those policies does not rise to the level of misconduct under the unemployment-compensation statute, that fact does not compel the conclusion that [defendant's] reliance on [plaintiff's] violation of those policies does not form a legitimate reason for the termination of [plaintiff's] employment and most assuredly does not compel the conclusion that [defendant's] proffered reason is a pretext for an otherwise impermissible discharge of [plaintiff] from [defendant's] employment in retaliation for filing a workers' compensation claim.

*Hale v. Hyundai Motor Mfg. Alabama*, 86 So. 3d 1015, 1025 (Ala. Civ. App. 2012).

The court finds that the DIR decision does not compel a conclusion that Sanso did not

rely upon Peterson's absence from the check-out desk without informing the check-in

personnel when patients were present as a reason for her decision to terminate plaintiff. The

court notes that the record contains evidence that Sanso had coached and counseled Peterson

about leaving the check-out desk unattended, taking lengthy and/or unscheduled breaks, and

not communicating with other employees. Indeed, Sanso had recently received complaints

from Carter that Peterson was leaving the check-out desk at times other than her scheduled break time.  Peterson admits she left the check-out desk unattended and that she did not notify the check-in employees.  Even if she had good and/or legitimate reasons for her actions, these reasons do not rebut head-on this articulated reason for her termination.  The fact that Sanso may have been mistaken about the circumstances or length of Peterson's break or that she acted harshly or unfairly, under these circumstances, does not support a finding that she has lied about Peterson's absence from the check-out desk motivating her termination decision.

### b.  Interpersonal Conflicts

The termination memorandum lists the January 2013 meeting with Peterson, during which Wilson and Sanso discussed her continuing problems with coworkers and "the importance of making the patient/customer priority over all other 'duties'."  (Doc. 31 at 8.) Carter had made recent complaints about Peterson's behavior that echoed the prior complaints of Peterson's coworkers.  Peterson argues that she did not have any conflicts with her coworkers based on the fact that Sanso had told the EEOC in December 2012 that there were no teamwork problems.  (Doc. 38 at 22 [citing doc. 25 at 149].)  The record evidence reveals that Sanso received the complaints from Carter and from Peterson after the EEOC's on-site visit, demonstrating on-going tension between these employees.  Given the significant history of tension and conflict between Peterson and other employees, the court finds

Peterson has not presented substantial evidence that this articulated reason for her termination was a lie.

### c. Unsatisfactory Job Performance/Failure to Follow Protocol

The termination memorandum states:

> In December we received a report from the Patient Ambulatory Office indicating there was a returned check for which you did not obtain the required information, which means we may incur financial loss from services rendered. During my January review of cash batches and receipts, I found three (3) additional returned checks for which you did not obtain the required information. This may result in a financial loss for the clinic if payment is not received. You are well aware of the protocol to obtain specific information for each check received.

(Doc. 31 at 8.) Peterson does not rebut this reason for her termination. She states only that she was not responsible for returned checks and that she knew the proper protocol for accepting checks, including the requirement that specific information, such as driver's license number, must appear on the front of the check. These facts do not rebut Sanso's testimony that she had at least four checks without the proper information and that this was one of the reasons she decided to terminate Peterson. Indeed, the evidence of the improper processing of these checks indicates that Sanso had reason to believe that Peterson was not following established protocol despite knowing the proper procedure and that her failure to record the driver's license information on a check was an on-going concern with her job performance.

### d.  Patient Complaint

The termination memorandum stated that Sanso received a patient complaint that Peterson had been rude during check-out.  (Doc. 31 at 7.)  Peterson denies that she was rude to a patient; however, she has not presented evidence that Sanso did not receive such a report. Moreover, the court notes that the complaint that Peterson was rude is similar in nature to other complaints Sanso had received about Peterson's interaction with patients and coworkers.  The court finds that Peterson has not rebutted this reason for her termination.

### e. Productivity

The termination memorandum states that one of the current issues with Peterson's job performance was that her productivity was much lower that her coworker's productivity, and "Inequality with workload causes co-worker tension when you are not perceived as being proactive or responsive with your job responsibilities." (Doc. 31 at 8.)   The court notes that on January 10, 2013, Peterson performed less than 50% as many transactions as Carter. Peterson contends that Carter, her coworker, told her to do all the precertifications and this caused her numbers to be lower than Carter's numbers.  Assuming Sanso was responsible for the adjustment in job duties and further assuming she was aware that precertifications required a significant amount of time to complete, a jury could find that Sanso had reason to believe that Peterson was not unproductive but had merely been otherwise occupied on the days at issue.  Therefore, the court finds an issue of fact as to whether this articulated reason for Peterson's termination was insufficient to motivate Sanso to terminate Peterson.  *See*

51

*Walker*, 53 F.3d at 1564.  Nevertheless, assuming evidence of pretext of this single reason is insufficient to establish the remaining reasons are pretext and insufficient to withstand the Foundation's Motion for Summary Judgment.  *See Crawford*, 482 F.3d at 1308-09.

Based on the foregoing, the court finds that Peterson has not shown that all the reason for her termination were a pretext for unlawful discrimination and/or retaliation.  Therefore, the Foundation's Motion for Summary Judgment will be granted and Peterson's Title VII and § 1981 termination and retaliation claims will be dismissed.

## B.  STATE-LAW CLAIM – RETALIATORY DISCHARGE

Peterson alleged that she was terminated because she had filed a claim for unemployment benefits.  Alabama law provides, "No employee shall be terminated by an employer ***solely*** because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits . . . ."  Ala. Code § 25-5-11.1 (emphasis added).

> In *Flint* [*Construction Co. v. Hall*, 904 So. 2d 236 (Ala. 2004)], the Alabama Supreme Court summarized, and to some extent clarified, how courts should approach claims under § 25-5-11.1 on a summary-judgment motion. First, a plaintiff must establish a prima-facie case of retaliatory discharge under § 25-5-11.1 by proving "1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim." [*Flint Construction Co.*, 904 So. 2d at] 247 (quoting *Alabama Power Co. v. Aldridge*, 854 So. 2d 554, 563 (Ala. 2002)).  Although a plaintiff must ultimately prove that the workers' compensation claim was the sole cause for termination in order to prevail, the fourth element of the prima-facie case may be established exclusively through circumstantial evidence that shows a causal link between the workers' compensation claim and the discharge.  *Id*. at 248.

52

To rebut the presumption of retaliation created by the prima-facie case, the employer may then offer legitimate reasons for the termination. *Id.* at 250. The plaintiff then bears the burden of showing that the stated legitimate reason is not true; if the plaintiff calls into question the validity of the stated reason, the plaintiff creates a jury question as to whether the workers' compensation claim was, in fact, the sole reason for termination. *Id.*

Thus, at the prima-facie-case stage, a plaintiff need not affirmatively prove that the workers' compensation claim was the "sole" cause of termination, but may use circumstantial evidence to create a presumption of retaliation; the question of whether the workers' compensation claim was the "sole cause" of retaliation is appropriately left to the pretext inquiry. *See id.*

. . .

[At the pretext stage,] "[a]n employer's stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers' compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status." [*Id.*] at 252 (quoting *Aldridge*, 854 So. 2d at 568).

*Smith v. CPI, Corp.*, 417 F. Supp. 2d 1253, 1256 (M.D. Ala. 2006).

The parties generally agree that Peterson can establish the first three parts of the prima facie case of retaliatory discharge; however, they disagree as to whether she can establish that she was terminated solely because of her on-the-job injury and her filing of a worker's compensation claim. The Alabama Supreme Court has "identified . . . certain factors that can be considered as circumstantial evidence of a causal connection between an employee's filing a workers' compensation claim and that employee's discharge," including "proximity in time between the filing of the workers' compensation claim and discharge," as well as:

1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee's injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee's work performance evaluations following a workers' compensation claim, and 6) evidence that the stated reason for the discharge was false.

*Id*. at 248 (quoting *Aldridge*, 854 So. 2d at 564-65 (quoting *Chhim v. University of Houston*, 76 S.W.3d 210, 218 (Tex. Ct. App. 2002); *Rebarchek v. Farmers Coop. Elevator & Mercantile Ass'n*, 35 P.3d 892, 899 (Kan. 2001))).

Peterson was terminated over a year after her on-the-job injury and six-months after she returned to work from surgery. Although she alleges that her coworkers were unhappy she had missed work for reasons related to her injury, she has presented no evidence that Sanso, the decision maker, expressed any negative attitude toward her "injured condition." She has pointed to no discriminatory treatment in comparison to similarly-situated employees or a failure to adhere to some company policy. Moreover, as set forth above, Peterson has not presented evidence that all the reasons for her termination were pretextual. Based on the evidence, the court finds that no reasonable jury could find that Peterson was terminated solely because of her on-the-job injury or her workers' compensation claim, and, therefore, Peterson has not demonstrated a prima facie case of retaliatory discharge.

The Foundation's Motion for Summary Judgment will be granted and Peterson's retaliatory discharge claim will be dismissed.

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and the Foundation is entitled to judgment as a matter of law. An Order granting the Foundation's Motion for Summary Judgment, (doc. 22), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 30th day of September, 2014.

SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE